**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **INFINITY CONSULTING**      * <br> **GROUP, LLC,** *et al.*, <br>                              * <br>     **Plaintiffs,** <br>                              * <br> v.                                             Case No.: GJH-20-981 <br>                              * <br> **UNITED STATES DEPARTMENT** <br> **OF THE TREASURY,** *et al.*,      * <br>                              <br>     **Defendants.**                   * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

In their Amended Complaint, ECF No. 8, Plaintiffs, two owners of Maryland small businesses, allege that when Defendants U.S. Department of the Treasury, the U.S. Small Business Administration ("SBA"), and the heads of both agencies (collectively, "Defendants") created guidelines governing the first round of funding for the recently created Paycheck Protection Program ("PPP") in early April 2020, they knowingly and intentionally discriminated against minority-owned and woman-owned businesses by prohibiting businesses without employees from applying for funding until a week after businesses with employees could apply, leaving only a short period before the funds were depleted. In anticipation of the President signing legislation authorizing a second round of funding for the program, which has now happened, Plaintiffs moved for a temporary restraining order and preliminary injunction halting the entire program from proceeding until Defendants take steps to guarantee more equitable distribution of PPP funds before they are exhausted a second time. Plaintiffs' claims arise under the Fifth Amendment of the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. §

706(2). The Court heard argument on the Motion in an on-the-record teleconference on April 24, 2020. For the following reasons, Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 9, will be denied.

## I.     BACKGROUND

On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281. The legislation created the PPP to permit small businesses impacted by the COVID-19 pandemic to obtain government-guaranteed loans from private lenders totaling up to $349 billion. *Id.* § 1102(b)(1). Defendants were charged with implementing the legislation and administering the PPP. *See, e.g.*, *id.* §§ 1106(k), 1109(b). According to the Amended Complaint, the guidelines Defendants issued for the program allowed businesses that have employees to apply for PPP loans beginning on April 3, 2020, but did not allow businesses without employees, such as Plaintiffs, to apply until April 10. ECF No. 8 ¶¶ 20–21. Plaintiffs further assert that Defendants failed to issue guidance for applications by non-employer businesses until late on April 14, effectively preventing those businesses from applying until April 15. *Id.* ¶ 21.

On April 16, however, the SBA announced that the funding allocated for the PPP by the CARES Act was exhausted. *Id.* ¶ 25. As a result, Plaintiffs allege, non-employer businesses essentially had only one day to apply for loans. *Id.* ¶ 26. Plaintiffs also allege that the guidance Defendants released provided calculations for program benefits and loan forgiveness that differed between businesses with employees and non-employer businesses, resulting in reduced benefits for non-employer businesses. *Id.* ¶ 22. Defendants did not provide any explanation or policy reasoning for either the separate application periods or the differing loan and forgiveness calculations, Plaintiffs assert. *Id.* ¶ 24. Finally, Plaintiffs offer statistics that they claim show that

non-employer businesses are disproportionately minority- and woman-owned. *Id.* ¶¶ 28–29, 57, 76, 94. Plaintiffs allege that Defendants "knew that discriminating against Nonemployer Businesses would disproportionately harm businesses owned by minorities and women," and that "[i]t has been widely reported by many congressional leaders that this very discrimination has occurred in the implementation of the PPP." *Id.* ¶¶ 27, 30.

Plaintiff Infinity Consulting Group, LLC, d/b/a Glitz and Glam Jewelry by LJ, is a Maryland limited liability company owned and operated by LeTresa Williams of Accokeek, Maryland, who is African-American. *Id.* ¶ 31; ECF No. 9-2 ¶ 2. A retail jewelry business without employees, Infinity applied for a PPP loan on April 10, 2020 through Bank of America, with which Infinity has an ongoing relationship. ECF No. 8 ¶¶ 33, 36–37. The bank's PPP application required applicants to upload payroll records, but because Infinity has no employees, Infinity submitted the application without including such records. *Id.* ¶ 37. On April 13, 2020, Bank of America contacted Infinity and directed it to provide payroll records. *Id.* ¶ 38. On April 16, Infinity uploaded a Schedule C tax form, showing its profit or loss for 2019. *Id.* Infinity was then provided with a loan number, but never received any funds or indication of when the funds would be issued. *Id.* Unsure if she had properly completed her application using the Infinity entity, Williams then tried to apply for a loan with Bank of America as a self-employed sole proprietorship. *Id.* ¶ 39. Because the bank had no specific application for businesses without employees, Williams submitted the same application she had used for Infinity. *Id.* On April 21, 2020, she received an email from Bank of America informing her that she could not complete her loan application until she uploaded her payroll records. *Id.*

Plaintiff Alvin Vaughn is a resident of Silver Spring, Maryland. *Id.* ¶ 40. Vaughn, who is African-American, owns an insurance and financial services business that he operates as a sole

3

proprietorship from his home. *Id.* ¶¶ 6, 41. Vaughn learned of the PPP program in early April 2020 and contacted Capital One Bank prior to April 10 to request information about applying. *Id.* ¶ 46. Capital One informed Vaughn that it was unable to process any PPP loan applications because it did not have sufficient guidance from the SBA on how to properly administer the funds and approve applications. *Id.* Vaughn was unable to locate an alternative lender before the PPP funds were exhausted on April 16. *Id.* Vaughn additionally complains that if he were able to submit an application, he would not have been permitted, under Defendants' guidance, to include any retirement contributions or health insurance costs in his requested amounts, which would have been permitted if he had payroll. *Id.*

In support of their pending motion, both Vaughn and Williams have submitted affidavits stating that the survival of their businesses is at risk because of the pandemic, that they were unable to apply for loans on April 3, 2020 when other business could apply, and that they believe they would have been approved and obtained funds had they been able to apply at that time. ECF No. 9-2 ¶¶ 10, 14, 18; ECF No. 9-3 ¶¶ 9–10, 13, 16.

Plaintiffs filed this action on April 17, 2020 and filed an Amended Complaint on April 21, seeking to represent a putative class of similarly situated minority and woman-owned non-employer businesses. ECF No. 1; ECF No. 8. The Amended Complaint includes four counts. Count I asserts that Defendants' decision to create two separate periods for PPP applications was motivated by an intent to discriminate against minority- and woman-owned non-employer businesses, violating the equal protection component of the Fifth Amendment. ECF No. 8 ¶¶ 72–78. Count II alleges that Defendants' guidelines violated the Administrative Procedure Act ("APA") because they were inconsistent with a direction in the CARES Act that the SBA should issue guidance ensuring that processing and disbursement of PPP loans prioritizes small

businesses owned and controlled by socially and economically disadvantaged individuals and women. *Id.* ¶¶ 80–83. Finally, Counts III and IV seek injunctive relief on the ground that the guidelines violate the APA and the Fifth Amendment. *Id.* ¶¶ 85–99.

Plaintiffs filed an Emergency Motion for a Temporary Restraining Order and Preliminary Injunction concurrently with their Amended Complaint. ECF No. 9. In the Motion, Plaintiffs state that they learned that a second round of PPP funding would be issued and that a TRO is necessary to prevent additional funds from being distributed until Defendants adopt guidance to ensure that the application process will be administered consistent with the Fifth Amendment. *Id.* ¶ 3. A proposed order Plaintiffs included asks the Court to order that Defendants: "shall allow all classes and types of qualifying small business entities to participate equally in the [PPP];" "shall not take any actions that will restrict qualifying Nonemployer Businesses from applying for loans under the [PPP];" "shall not take any actions that will discriminate against Nonemployer Businesses in the implementation of the [PPP], including, but not limited to, determining loan amounts, determining loan forgiveness qualifications, and settling application deadlines;" and "shall issue guidance requiring all lending institutions issuing [PPP] loans to process any and all [PPP] loan applications on a first come, first served basis." ECF No. 9-4 at 1–2.[1]

Following a telephonic scheduling conference, Defendants filed a response in opposition to Plaintiffs' Motion on April 24, 2020. ECF No. 19. Later that day, the parties alerted the Court in a status report that President Trump had signed the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620, which provides additional funding for the PPP. ECF No. 20. Defendants then filed a notice informing the Court that the individual Defendants, Treasury Secretary Steven Mnuchin and SBA Administrator Jovita Carranza, had

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

issued a joint statement announcing that the SBA will resume accepting applications from approved PPP lenders on "Monday, April 27, 2020 at 10:30 AM EDT" and that applications submitted by "approved lenders on behalf of any eligible borrower" will be accepted. ECF No. 21 at 1 (quoting ECF No. 21-1 at 2). The announcement also states that "[a]ll eligible borrowers who need these funds should work with an approved lender to apply." *Id.* (quoting ECF No. 21-1 at 2). The Court held an on-the-record teleconference on the evening of April 24, 2020 to hear argument on Plaintiffs' Motion.

## II. STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013)). "The substantive requirements for a TRO and a preliminary injunction are identical." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 376 (D. Md. 2019) (citing *U.S. Dep't of Labor v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006)). A plaintiff seeking relief "must demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Di Biase*, 872 F.3d at 230 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). Plaintiffs seeking a TRO must meet all of these requirements to obtain relief. *Pashby*, 709 F.3d at 320–21 (citing *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009)).

## III. DISCUSSION

The Court first considers whether Plaintiffs' request for relief may be moot in light of the April 24, 2020 joint statement from Defendants Mnuchin and Carranza that applications

submitted by "approved lenders on behalf of any eligible borrower" will be accepted. ECF No. 21-1 at 2. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). During the teleconference with the Court, Defendants asserted that the April 24 notice ameliorates the concerns Plaintiffs have raised about the separate application periods that Defendants allegedly used for the first portion of PPP funds, thereby obviating any grounds for prospective relief. Plaintiffs contended that they continue to suffer ongoing harm from the alleged constitutional violations in the first round of funding because the alleged separate periods delayed Plaintiff Infinity in submitting its application, resulting in the application being placed later in a "queue" of applications waiting to be approved when the second round of funds become available.[2]

      Plaintiffs' argument regarding the impact of the original PPP on their current efforts is not clear as an evidentiary matter based on any documentation provided to the Court. On the record as it currently stands, the Court is unable to conclusively determine whether or not Plaintiffs' claims have been mooted by the passage of the Paycheck Protection Program and Health Care Enhancement Act and the individual Defendants' subsequent announcement. Given the exigency presented by the Motion, however, as well as other deficiencies in the Motion, the Court will nonetheless resolve the issues presented on their merits.

---

[2] Plaintiffs also asserted that an additional group of self-employed business owners who founded their businesses in 2020 were unable to apply for PPP loans in the first round of funding and remain unable now. No references to this group appear in Plaintiffs' filings, however, as Plaintiffs conceded in the teleconference, though in a filing submitted the following day Plaintiffs asserted that they are prepared to amend the Amended Complaint to add a plaintiff in the category at issue. ECF No. 22. Plaintiffs did not assert during the teleconference, however, that this purported group of business owners who allegedly have been excluded from the PPP is disproportionately comprised of women or members of minority communities. It is thus unclear how amending the pleadings to add a plaintiff from this group would support a new claim or address the flaws with Plaintiffs' existing claims.

The Court thus turns to whether Plaintiffs have met the requirements to obtain a TRO.[3] First, and critically, Plaintiffs have failed to show a likelihood of success on the merits. Of the four claims in the Amended Complaint, three derive from the assertion that Defendants knowingly and intentionally discriminated against minority-owned and woman-owned non-employer businesses, violating the equal protection component of the Fifth Amendment's Due Process Clause. ECF No. 8 ¶¶ 74–77, 86–88, 92–95; *see also id.* ¶ 3, 27. Plaintiffs' burden to prove such a constitutional violation is heavy. To succeed on such a claim, Plaintiffs must show that an "invidious discriminatory purpose was a motivating factor" behind the Defendants' decisionmaking in administering the PPP. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "Proof" of such "intent or purpose is required." *Id.* at 265. While Plaintiffs muster great effort towards demonstrating the impact of Defendants' actions on woman- and minority-owned businesses, there is a complete deficit of evidence demonstrating that discriminatory purpose was a motivating factor.

This is critical to the resolution of this Motion because, while "a showing of disparate impact on a protected group and the foreseeability of this impact is relevant to prove that the decisionmaker acted with a forbidden purpose, 'impact alone is not determinative, and the Court must look to other evidence.'" *Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 753 (D. Md. 2019) (quoting *Arlington Heights*, 429 U.S. at 266). Other evidence may include:

> (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from

---

[3] The Court notes Defendants' argument that a statute concerning the SBA, 15 U.S.C. § 634(b)(1), strips courts of jurisdiction to issue injunctions against the agency. ECF No. 19 at 11. Because the Court denies Plaintiffs' Motion on substantive grounds, the Court need not settle this statutory interpretation question and simply assumes without deciding that the statute does not bar this action.

> normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 819 (4th Cir. 1995).

Plaintiffs have provided no such evidence here. While the record is expectedly limited at this early stage, Plaintiffs have offered no persuasive indication that they would be able to produce any of these types of materials to support their serious allegations of intentional, purposeful discrimination by Defendants. And the materials that Plaintiffs have provided to support their primary allegation, which is that "Defendants knew that discriminating against Nonemployer Businesses would disproportionately harm businesses owned by minorities and women," are only weakly probative. ECF No. 8 ¶ 27. As evidence for the gender discrimination component of this claim, Plaintiffs cite statistics that appear to derive from SBA surveys indicating that 89.5 percent of firms owned by women are non-employer firms. *Id.* ¶ 29. That statistic is not informative on its own. It is impossible to determine whether a policy that harms non-employer firms is discriminatory on a gender basis without knowing the percentages of businesses owned by both men and women that are non-employer. If, for example, 89.5 percent of firms owned by men are also non-employer firms, a policy harmful to non-employer firms impacts business owners of both genders equally. From the materials Plaintiffs have provided, therefore, the Court cannot determine whether Defendants' alleged policies have a disparate impact on woman-owned businesses, let alone draw an inference of an intent to discriminate against them.

With respect to racial discrimination, Plaintiffs cite SBA data indicating that "[a]pproximately 79% of all white-owned businesses and 96% of black-owned businesses are nonemployer, respectively." *Id.* ¶ 29. Plaintiff also assert elsewhere in the Amended Complaint, without citation, that 88.6 percent of firms owned by minorities are non-employer businesses. *Id.*

9

¶¶ 57, 76, 94. These statistics demonstrate only a marginal difference between minority and non-minority rates of ownership of non-employer firms. In other words, while some 9 in 10 businesses owned by minority entrepreneurs would be negatively impacted by a policy that favors firms with employees, 8 in 10 white-owned businesses would also be similarly harmed. Additionally, these numbers do not inform the Court of the percentage of non-employer or employer businesses respectively owned by minorities, a number which may or may not tell the same story as the data provided depending on the total number of businesses founded by each demographic group. The fact that most minorities who choose to start a business start a non-employer business does not, by necessity, mean that non-employer businesses are disproportionately owned by minorities. And even if one assumes disparate impact, Plaintiffs, as stated earlier, fail to demonstrate intent. In short, Plaintiffs' attempt to equate a supposed policy preference for employer businesses with an intentional effort to discriminate against businesses owned by women and minorities falls woefully short of the mark.[4]

Furthermore, even if Plaintiffs had provided more substantial allegations to support their broader discrimination claim on the merits, it remains unclear whether, for purposes of standing, these specific Plaintiffs have actually been harmed by the Defendants' allegedly discriminatory decisionmaking. Plaintiff Infinity asserts that it tried to obtain a PPP loan beginning on April 10, 2020 "under Bank of America's PPP application process," ECF No. 8 ¶ 36. On April 13,

---

[4] The Amended Complaint also alleged that "[i]t has been widely reported by many congressional leaders that this very discrimination has occurred in the implementation of the PPP." ECF No. 8 ¶ 30. During the teleconference, Plaintiffs requested permission to file a supplement including statements corroborating this allegation, which the Court granted. Plaintiffs filed the supplement on April 25, 2020. ECF No. 22-1. While the supplement includes several statements by lawmakers expressing concern about minority-owned businesses lacking ready access to PPP funds, *see id.* at 7–10, none of the statements allege or offer evidence of discriminatory intent in Defendants' design of the program. Several appear to primarily take issue with the fact that some lenders have only made loans to businesses with which they had preexisting relationships. Judge Gallagher of this Court recently rejected the argument that the CARES Act prohibits lenders from imposing such requirements for PPP loans. *Profiles, Inc. v. Bank of Am. Corp.*, No. SAG-20-0894, 2020 WL 1849710, at *7–*8 (D. Md. Apr. 13, 2020).

however, "Plaintiff Infinity received additional correspondence from Bank of America requiring that the business provide its payroll records." *Id.* ¶ 38. When Williams, Infinity's owner, tried to apply later that day as a self-employed sole proprietorship, she found that "Bank of America did not offer a specific application for Nonemployer Business applicants." *Id.* ¶ 39. In short, the Amended Complaint appears to allege that Williams' issues with her applications stemmed solely from difficulties with Bank of America's application process.[5]

The same is true for Plaintiff Vaughn, who asserts that he was not able to submit an application because his chosen bank, Capital One, lacked sufficient guidance from SBA "on how to properly administer the funds and approve the applications" before the PPP funds were exhausted. *Id.* ¶ 46; *see also* ECF No. 9-3 ¶ 14. While both Plaintiffs' affidavits state a belief that they were eligible for PPP loans and could have obtained loans if they were allowed to apply beginning on April 3, neither the Amended Complaint nor any other materials in the record support those assertions. ECF No. 9-2 ¶ 18; ECF No. 9-3 ¶ 16. Additionally, while Plaintiffs' filings include references to some of the rules and guidance materials that Defendants have issued for the PPP, Plaintiffs have not provided a citation or documentation that corroborates their allegations that Plaintiffs as non-employer businesses were ineligible to apply for loans on April 3 and were required to wait until April 10.

As Defendants note in their Opposition, these dates appear to derive from two undated information sheets that appear on the Treasury Department's website and which Defendants included as exhibits to their brief. ECF No. 19 at 13 n.6 (citing ECF Nos. 19-5, 19-6). One states that "[s]tarting April 3, 2020, small businesses and sole proprietorships can apply. Starting April

---

[5] The Court notes that Plaintiffs asserted at the teleconference that it was an SBA-provided form that required payroll records, rather than one prepared by Plaintiffs' lenders. That allegation appears nowhere in Plaintiffs' filings, however, and appears to be inconsistent with Plaintiffs' allegations in the Amended Complaint.

10, 2020, independent contractors and self-employed individuals can apply." ECF No. 19-6 at 2. The other information sheet describes the same two sets of business types and states that starting on those respective dates, each category of business "can apply for and receive loans to cover their payroll and other certain expenses through existing SBA lenders." ECF No. 19-6 at 2. During the teleconference, the parties appeared to disagree as to whether Plaintiffs were, in fact, precluded from applying on April 3 when "small businesses and sole proprietorships" were permitted to apply.

However, even assuming that the Amended Complaint implicitly and correctly refers to and incorporates these information sheets, Plaintiffs have made no specific allegations that they were aware of these documents, which were provided by Defendants, or timed their attempts to apply for funding after reviewing them. And Plaintiffs' affidavits do not provide any explanation for their apparent beliefs that they could not apply for funding until April 10. As a result, Plaintiffs have not set forth a sufficient basis for an inference that the harms they claim to be suffering are traceable to Defendants' alleged discriminatory decisions, casting substantial doubt on whether they have standing for this action. *See Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017) (describing the injury, causation, and redressability requirements for Article III standing).

The Court finally notes that Plaintiffs have also failed to demonstrate a likelihood of success on the merits of their statutory APA claim, which asserts that Defendants' guidance is inconsistent with § 1102(b)(P)(iv) of the CARES Act. That provision states that:

> It is the sense of the Senate that the Administrator should issue guidance to lenders and agents to ensure that the processing and disbursement of covered loans prioritizes small business concerns and entities in underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by

> socially and economically disadvantaged individuals (as defined in section 8(d)(3)(C)), women, and businesses in operation for less than 2 years.

134 Stat. 293. Plaintiffs' Motion does not address this claim. Defendants persuasively argue, however, that this language, which states that the SBA Administrator "should issue guidance" rather than "shall," is merely precatory rather than mandatory. ECF No. 19 at 16. Notably, courts have held that "sense of the Congress" provisions that contain the word "should" are mere "policy statements that do[] not create positive, enforceable law." *See Yang v. Cal. Dep't of Soc. Servs.*, 183 F.3d 953, 958–59 (9th Cir. 1999); *cf. Emergency Coalition to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 14 n.6 (D.C. Cir. 2008) (stating that "a sense of Congress resolution is not law"). This claim is therefore unlikely to succeed. Accordingly, Plaintiffs have failed to demonstrate a likelihood of success on the merits of any of their claims.

Even if all of the apparent defects in Plaintiffs' filings were remedied and Plaintiffs demonstrated a likelihood of success on the merits on one or more of their claims, however, Plaintiffs have failed to meet the requirement that the issuance of preliminary relief be in the public interest. *Di Biase*, 872 F.3d at 230. Plaintiffs' Motion asks that the Court "issue the requested injunction and require the Defendants to issue guidance that will guarantee more equitable distribution of funds before the PPP funds are exhausted for the second time." ECF No. 9-1 at 11. Plaintiffs thus essentially ask the Court to enjoin the entire PPP program and bar the release of the hundreds of billions of dollars Congress has allocated to address ongoing and catastrophic economic harm until Defendants issue new guidance remedying the allegedly discriminatory components of the original guidance.

The Court concludes that it would not be in the public interest to do so. While it is possible that the forthcoming PPP funds will be distributed in a manner that results in unfairness to some business owners, it is certain that blocking implementation of the program entirely

13

would prevent any funding whatsoever from reaching desperate small businesses as the nationwide economic devastation of the pandemic continues to mount. Plaintiffs have not shown that their own potential injury outweighs the chaos that would likely result from indefinitely enjoining the release of the hundreds of billions of dollars that Congress has allocated for struggling firms across the country. In fact, such a step would likely do far more harm than good by leaving the Court to oversee the administration of the federal government's response to the havoc the pandemic has wreaked on the nation's economy, a task far outside the limited role of the federal judiciary.

To be clear, the Court appreciates and is sympathetic to Plaintiffs' assertions that they will suffer irreparable harm if their current financial peril results in the failure of their businesses, an argument with support in case law. *See, e.g.*, *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (noting that "irreparable harm may . . . exist where the moving party's business cannot survive absent a preliminary injunction"). But in order to obtain the relief they seek here, Plaintiffs must demonstrate a likelihood of success on their claims and show that issuing relief would be in the overall interest of the greater public. Because Plaintiffs have not done so here, their motion for emergency relief must be denied.

IV.  **CONCLUSION**

For the foregoing reasons, Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 9, is denied. A separate Order shall issue.

Date: <u>April 26, 2020</u>                    __/s/_____
                                              GEORGE J. HAZEL
                                              United States District Judge